# Exhibit A

 CT Corporation

**Service of Process Transmittal**
06/07/2021
CT Log Number 539691350

TO:     Boris Kogan
        Ellie Mae, Inc.
        4420 ROSEWOOD DR STE 500
        PLEASANTON, CA 94588-3059

RE:     **Process Served in California**

FOR:    Ellie Mae, Inc.  (Former Name)  (Domestic State: DE)
        Ice Mortgage Technology, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | TENA Companies, Inc., Pltf. vs. Ellie Mae, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # NONE |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/07/2021 at 14:40 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/08/2021, Expected Purge Date: 06/13/2021 |
| | Image SOP |
| | Email Notification,  Boris Kogan  boris.kogan@elliemae.com |
| | Email Notification,  Heather Dunn Navarro  heather.dunnnavarro@elliemae.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>818 West 7th Street<br>Los Angeles, CA 90017<br>866-539-8692<br>CorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**              Mon, Jun 7, 2021

**Server Name:**       BFRM LEGAL


Entity Served          ELLIE MAE, INC.

Case Number            NONE

Jurisdiction           CA



**STATE OF MINNESOTA**                                   **DISTRICT COURT**

                                              **SECOND JUDICIAL DISTRICT**
**COUNTY OF RAMSEY**
                                                  **CASE TYPE: CONTRACT**

---

TENA Companies, Inc.,                        Court File No.

        Plaintiff,                          **SUMMONS**

    v.

Ellie Mae, Inc.,

        Defendant.

---

This Summons is directed to (name of Defendant):

    **Ellie Mae, Inc.**

1.    **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.    **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called <u>service</u>. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

    ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at <u>www.mncourts.gov/forms</u> under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.    **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything it asked for in its *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can then be entered against you for what the Plaintiff asked for in the *Complaint*.

        To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

        **Robins Kaplan LLP**
        **800 LaSalle Avenue, Suite 2800**
        **Minneapolis, MN 55402**

5.      Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

   - Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

   - Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7.      **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

Dated: June 7, 2021

ROBINS KAPLAN LLP

By: _____

Sylvia R. Ewald
SEwald@RobinsKaplan.com

800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Telephone:    612 349 8500
Facsimile:    612 339 4181

Attorneys for Plaintiff
TENA Companies, Inc.

**STATE OF MINNESOTA**

**COUNTY OF RAMSEY**

**DISTRICT COURT**

**SECOND JUDICIAL DISTRICT**

**CASE TYPE: CONTRACT**

---

TENA Companies, Inc.,

    Plaintiff,

  v.

Ellie Mae, Inc.,

    Defendant.

Court File No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff TENA Companies, Inc. ("TENA"), files this complaint against Ellie Mae, Inc., ("Ellie Mae"), and states and alleges as follows.

## NATURE OF THIS ACTION

1. TENA has created important content about mortgage compliance laws for use in TENA's and Ellie Mae's AllRegs ReportBuilder product for 15 years. As part of the written contractual agreement governing the parties' business relationship, Ellie Mae made a number of promises to TENA in order to protect TENA's significant investment: Ellie Mae promised that any product it issued that competed with or is similar to ReportBuilder must be independent and distinct, that it would not issue a product that competes with or is similar to ReportBuilder under the AllRegs Brand during the term or within three years of termination of the agreement, and that it would not use ReportBuilder software code in a product that competes with ReportBuilder during the term or within three years of termination of the parties' agreement.

2. Ellie Mae gave notice in September 2020 that it was terminating the parties' agreement effective April 1, 2021. But instead of complying with its promises to TENA, Ellie

Mae decided to flout those obligations. Ellie Mae stopped offering ReportBuilder and issued a

competing "Reporting Tool" on March 20, 2021. Like ReportBuilder, the Reporting Tool allows

a user to create a report to compare selected mortgage compliance topics and jurisdictions. Ellie

Mae issued the Reporting Tool under the AllRegs Brand. And the Reporting Tool's user

interface is nearly identical to that of ReportBuilder. In sum, Ellie Mae is offering a product that

is remarkably similar to and competes with ReportBuilder, in direct violation of the parties'

contractual agreement.

## PARTIES

3.     Plaintiff TENA Companies, Inc. is a corporation organized under the laws of the

State of Minnesota, with its principal place of business located at 251 West Lafayette Frontage

Road South, St. Paul, Minnesota.

4.     Defendant Ellie Mae, Inc. is a corporation organized under the laws of the State of

Delaware, with its principal place of business located at 4420 Rosewood Drive, Suite 500,

Pleasanton, California.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to Minn. Stat.

§ 484.01.

6.     This Court has personal jurisdiction over Ellie Mae because Ellie Mae has had

significant contacts with Minnesota; Ellie Mae's actions have caused injury in Minnesota;

Minnesota has a substantial interest in providing a forum; and the burden placed on Ellie Mae by

being brought under this State's jurisdiction does not violate traditional notions of fair play and

substantial justice.

7.     Venue is proper in the Second Judicial District under Minn. Stat. § 542.09 because it is the district in which the cause of action or some part thereof arose.

8.     Additionally, the parties' contractual agreement provides that any dispute arising under the agreement shall be venued in a state or federal court situated within the State of Minnesota, and that the parties irrevocably submit themselves to the personal jurisdiction of such courts for that purpose.

## FACTS

### TENA is a National Leader in Mortgage Quality Control

9.     For nearly 40 years, TENA has been a national leader in mortgage quality control.

10.     TENA was founded in 1982 to offer risk management solutions to the mortgage industry. TENA has developed many products and services to help mortgage providers ensure that they are complying with the agency, state, and federal regulations that apply to mortgage lending.

11.     Among other services, TENA provides mortgage audit services to mortgage loan originators and servicers, which entails examination of all aspects of a real estate mortgage loan transaction to ascertain if the loans meet federal, state, and agency lending standards. And among other products, TENA developed an audit software application called SecondLook, which provides a quality control audit service for mortgage lenders and mortgage servicers.

12.     Through these services and products, TENA has developed deep expertise in the regulations and laws with which mortgage lenders and servicers must comply.

### TENA and AllRegs Team Up

13.     On February 1, 2005, TENA entered into a General Services Agreement ("General Services Agreement") with Mortgage Resource Center, Inc. ("AllRegs"). (A true and

correct copy of the General Services Agreement, dated February 1, 2005, is attached hereto as **Exhibit A**.)

14.     AllRegs had been offering an online state regulatory compliance product called "State Analysis and Commentary." State Analysis and Commentary provided long-form information about mortgage lending statutes and regulations in the 50 United States and various other jurisdictions.

15.     Under the General Services Agreement and attached Schedule 1, TENA agreed to support the AllRegs State Analysis and Commentary product by creating summarizations of state statutes and regulations while preserving their meaning and intent yet making them understandable to non-lawyer mortgage professionals.

### TENA and AllRegs Work on New Product Called "State Compliance ReportBuilder"

16.     About a year later, on February 28, 2006, AllRegs and TENA entered into Schedule 2 to the General Services Agreement ("Schedule 2"). (A true and correct copy of Schedule 2 to the General Services Agreement, dated February 28, 2006, is attached hereto as **Exhibit B**.)

17.     Schedule 2 was intended to facilitate TENA's and AllRegs's co-development of a web-based query application, called the "State Compliance ReportBuilder," to work in conjunction with and augment the functionality of AllRegs's State Analysis and Commentary product.

18.     The ReportBuilder product would allow the user to select (a) one or more jurisdictions, (b) one or more topics related to mortgage lending statutes and regulations, and (c) generate a report tailored to the selected jurisdiction(s) and topic(s).

19.     AllRegs was to design and develop the user interface for the State Compliance ReportBuilder, and TENA was to create and support the content for the State Compliance ReportBuilder.

20.     The content TENA was to create would consist of thousands of succinct summaries covering an array of mortgage lending topics for 51 jurisdictions (50 states and the District of Columbia). The content was called "Matrix Content," which was to be organized into "State Compliance Matrices."

21.     TENA's content summarized statutes and regulations in a way that preserved their meaning and intent, yet were understandable to a non-lawyer mortgage professional.

22.     TENA's duties included: (i) writing new content about existing mortgage-lending and service-related statutes and regulations; (ii) writing new content about newly enacted statutes and regulations; (iii) revising existing Matrix Content to reflect changes made to statutes and regulations; and (iv) making editorial corrections to Matrix Content as requested by AllRegs or identified as necessary by TENA.

23.     AllRegs and TENA agreed to split evenly gross receipts from the licensing of ReportBuilder.

24.     Schedule 2 included a number of provisions that limited the ability of AllRegs and TENA to compete with ReportBuilder during and after the termination of the parties' agreement.

### Ellie Mae Steps Into AllRegs's Shoes

25.     In 2014, Ellie Mae, Inc. acquired AllRegs's right, title, interest, and obligations under the General Services Agreement and Schedule 2. Ellie Mae, AllRegs, and TENA subsequently entered into an Amendment, Assignment, Assumption and Waiver Agreement

("Amendment Agreement"), dated August 6, 2014. (A true and correct copy of the Amendment,
Assignment, Assumption and Waiver Agreement, dated August 6, 2014, is attached hereto as
**Exhibit C**.)

26.     Ellie Mae and TENA agreed as part of the Amendment Agreement to be bound by
all terms of the General Services Agreement and Schedule 2 as modified by the Amendment
Agreement.

27.     Because Ellie Mae is a large company with many different product lines, it sought
to renegotiate the provisions in the General Services Agreement that limited its ability to offer
products that competed with AllRegs ReportBuilder. The Amendment Agreement provided that
its purpose was to modify the scope of certain provisions in the General Services Agreement and
Schedule 2 relating to Ellie Mae's and TENA's ability to compete in certain lines of business or
sell certain products or services. The Amendment Agreement accordingly narrowed the scope of
restrictions on competition.

<u>**Agreement's Protection of Parties' Investment**</u>

28.     Schedule 2 and the Amendment Agreement include a number of duly negotiated
pre- and post-termination provisions that serve to protect both Ellie Mae's and TENA's
investments of expertise, time, and resources in ReportBuilder.

29.     Section 14(c) of Schedule 2 provides that in the event TENA terminates
Schedule 2 without cause, AllRegs shall have the option to purchase for $1.00 a non-exclusive
copy of TENA's State Compliance Matrices, including right, title, and interest in and to the
ownership of such copy and joint copyright thereto; a non-exclusive copy of TENA's Matrix
Database Maintenance Tool, including source code and object code versions and interpretive

comments, documentation, and user manuals; and a non-exclusive, royalty-free, perpetual license to use, reproduce, and make derivatives of the Matrix Database Maintenance Tool.

30.    Section 14(d) of Schedule 2 provides that in the event AllRegs terminates Schedule 2 without cause, TENA shall have the option to purchase a non-exclusive copy of AllRegs's User Interface for $1.00.

31.    Section 3 of the Amendment Agreement provides that the parties agree to waive certain provisions of the General Services Agreement and Schedule 2 that purport to prevent the parties from providing any competing or similar product or service to ReportBuilder "so long any such competing or similar products and services are developed, sold, or otherwise provided in a manner that is independent and distinct from that of the AllRegs brand of products and services."

32.    Section 3 goes on to provide that "all Parties agree and acknowledge that [Ellie Mae] is constrained from the development, sale or offering of any product or service under the AllRegs Brand that directly competes with ReportBuilder during the Term of the Agreement." Section 3 adds that "in the event [Ellie Mae] terminates the Agreement [without cause]. . . [Ellie Mae] cannot issue a competing or similar product to ReportBuilder under the AllRegs Brand for 3 years from the date of termination."

33.    Section 5 of the Amendment Agreement provides that "[i]n connection with any product that [Ellie Mae] develops or acquires that may directly or indirectly compete with ReportBuilder, [Ellie Mae] will not utilize or incorporate any products or software code of [AllRegs] in existence immediately prior to the consummation of the Sale Transaction or any reasonable extensions and/or improvements thereto that occurs after the consummation of the Sale Transaction, during the Term [of] the Agreement." Section 5 adds that "in the event [Ellie

Mae] terminates the Agreement [without cause] . . . [Ellie Mae] may not utilize or incorporate any products or software code of [AllRegs] in existence immediately prior to the consummation of the Sale Transaction or any reasonable extensions and/or improvements thereto that occurs after consummation of the Sales Transaction for 3 years from the date of termination."

### AllRegs ReportBuilder

34.     As explained in Schedule 2, the AllRegs ReportBuilder is an online query program that allows users to build reports that include brief synopses of one or more compliance topics in one or more jurisdictions. While the State Analysis & Commentary product includes lengthier narrative discussions of compliance information, the ReportBuilder allows users to quickly compare compliance information across multiple states.

35.     TENA's work on the ReportBuilder was a significant undertaking. TENA constantly monitored changing laws and regulations, and TENA drafted and kept up-to-date nearly 19,000 cells of summary data. This accounts for 22 topics and 277 subtopics, across 51 jurisdictions (50 states and the District of Columbia).

36.     The summary data was organized into more than 20 different matrices on the following main topics: Adjustable Rate Mortgages, Advertising, Balloon Loans, Borrower Paid Fees, Borrower Repayment Ability, Breach of Security, Disclosures – Loan Production, Foreclosure, High-Cost/Covered Loans, Licensing and Registration, Loan Modification/Foreclosure Prevention, Mandated Indexes, Notary Public, Power of Attorney, Property Rights and Required Signatures, Recordkeeping and Record Retention, Refinancing, Reverse Mortgages, Servicing, Subprime Loans, Usury, and Wet Settlement.

37.     Prior to March 20, 2021, ReportBuilder was accessed from the State Compliance section of AllRegs's website, where a user could create a new report by clicking on "New Report."



38.     The user could then select one or more jurisdictions to include in the report.



39.   Once done selecting the jurisdictions, the user then selected the topics or subtopics to include in the report.



40.   The user then chose a layout, either state by topic or topic by state.



41.    The user then generated the report. There was a table of contents in a pane on the left, from which a user could select the state and topic for the content they would like to review. The content was in a pane in the middle of the screen. And there was a button in the bottom right hand corner that allowed a user to save the report for future reference.



42.     The user could also export the report into an Xcel spreadsheet, Word document,

or HTML.



## TENA and Ellie Mae Had a Productive Working Relationship

43.     The business relationship between TENA and Ellie Mae was a productive one.

TENA and Ellie Mae's predecessor AllRegs co-developed the product. And for approximately

15 years, the AllRegs ReportBuilder tool, which incorporated TENA's Matrix Content, was a

key compliance tool for the mortgage lending industry.

44.     TENA and Ellie Mae split the proceeds from ReportBuilder evenly. In recent

years, TENA's portion of revenue from the ReportBuilder product has totaled approximately $1

million per year.

## Ellie Mae Provides Notice of Termination

45.     On information and belief, in September 2020, Intercontinental Exchange, Inc.

acquired Ellie Mae for approximately $11 billion.

46.     On September 22, 2020, Ellie Mae sent TENA a letter in which Ellie Mae provided notice that it was terminating Schedule 2. Consistent with the notice requirements set out in the parties' contractual agreement, the termination was to be effective as of April 1, 2021.

47.     On October 12, 2020, TENA sent a letter to Ellie Mae in response. TENA elected to exercise its option under Section 14(d) of Schedule 2 to purchase a copy of the User Interface. TENA also reminded Ellie Mae of several contractual restrictions, including that Ellie Mae may not issue a competing product to ReportBuilder under the AllRegs Brand for three years from the date of termination (under Section 3 of the Amendment Agreement) and that Ellie Mae may not use any AllRegs products or software code for three years from the date of termination (under Section 5 of the Amendment Agreement).

48.     The parties corresponded regularly over the next several months.

49.     In multiple letters, Ellie Mae took the position that Section 3 of the Amendment Agreement was invalid and unenforceable, though it assured TENA that the matter could be resolved amicably.

50.     Ellie Mae also represented in its correspondence that it would provide TENA a copy of the User Interface. Despite having six months to do so, Ellie Mae said the earliest it could provide the copy of the User Interface would be April 15, 2021, and ultimately provided the User Interface materials on April 9, 2021.

**Ellie Mae Begins Advertising an "Enhancement" to its Analysis and Commentary Tools**

51.     All the while, Ellie Mae was preparing to breach its unambiguous contractual obligations by issuing a ReportBuilder copycat.

52.     On March 1, 2021, upon logging in to AllRegs ReportBuilder, users saw a pop-up message. The pop-up message notified them that the AllRegs ReportBuilder tool would no

longer be available effective March 20th, but that Ellie Mae would be releasing new "enhancements" for AllRegs's Analysis and Commentary tools.



53.     When users clicked on the indicated hyperlink to learn more about the enhancements to the Analysis and Commentary tools, they were directed to a three-minute long promotional video. As of June 4, 2021, the video was still available at https://player.vimeo.com/video/507181964.



54.     The video explained that Ellie Mae would begin offering what it called the "AllRegs Analysis & Commentary Reporting Tool," which "allows you to build reports that compare different states and different compliance topics side by side."

### Ellie Mae's "New" Reporting Tool is Remarkably Similar to ReportBuilder

55.     On March 20, 2021, Ellie Mae stopped offering the AllRegs ReportBuilder and began offering access to its "new" Reporting Tool ("Reporting Tool").

56.     Ellie Mae's Reporting Tool competes with and is remarkably similar to AllRegs ReportBuilder.

57.     Like ReportBuilder, Ellie Mae's Reporting Tool is accessible from the State Compliance Analysis and Commentary section of AllRegs's website. That landing page for the Reporting Tool says, "Quickly compare compliance information across multiple states with the updated reporting and exporting features of AllRegs Analysis & Commentary."



58.     The user can click on "My Reports" and then "New Reports" to begin a new
report.



59.     Like ReportBuilder, the Reporting Tool user can then select one or more
jurisdictions to include in the report.



60.     Like ReportBuilder, once done selecting the jurisdictions, the Reporting Tool user then selects the topics or subtopics to include in the report.



61.     Like ReportBuilder, the Reporting Tool user then chooses a layout, either state by topic or topic by state.



62.     The Reporting Tool user can then generate a report. Like ReportBuilder, there is a table of contents in a pane on the left, from which a user can select the state and topic for the content they would like to review. Like ReportBuilder, the content is in a pane in the middle of the screen. And like ReportBuilder, there is a button in the bottom right hand corner that allows a user to save the report for future reference.



63.     Like ReportBuilder, the user can also export the report into a Word document or HTML.



64.     ReportBuilder and Ellie's Reporting Tool cover substantially the same topics and sub-topics and the same jurisdictions.

65.     Like ReportBuilder, Ellie Mae's Reporting Tool is being issued under the AllRegs Brand.

66.     Ellie Mae is providing its Reporting Tool in a manner that is not independent or distinct from the AllRegs's brand of products and services.

67.     On information and belief, Ellie Mae's Reporting Tool uses or incorporates "products or software code" of AllRegs that was in existence immediately prior to the consummation of Ellie Mae's acquisition of AllRegs's interests in the General Services Agreement, or any reasonable extensions and/or improvements thereto that occurred after consummation of said acquisition.

68.     In light of Ellie Mae's deliberate breach of its contractual obligations and baseless assertions that part of the parties' contractual agreement is invalid, TENA had no choice but to initiate this lawsuit and seek appropriate injunctive and monetary relief.

## CLAIM I: BREACH OF CONTRACT

69.     TENA incorporates paragraphs 1 through 68 as if alleged fully herein.

70.     Ellie Mae and TENA entered into a valid contractual agreement under which TENA provided services to Ellie Mae related to Ellie Mae's AllRegs ReportBuilder.

71.     At all times, TENA fulfilled its obligations under its contractual agreement with Ellie Mae.

72.     Ellie Mae, in contrast, breached the contract, including by (1) offering the Reporting Tool, a product that competes with and/or is similar to ReportBuilder and that was not developed, sold, or otherwise provided in a manner that is independent and distinct from that of the AllRegs' brand of products and services; (2) offering the Reporting Tool, a product that directly and indirectly competes with and/or is similar to ReportBuilder, under the AllRegs Brand during the term of Schedule 2 and within three years of the termination of Schedule 2; and (3) offering the Reporting Tool, a product that directly and/or indirectly competes with ReportBuilder and appears to use AllRegs "products or software code" in existence in August 2014 or any reasonable extensions and/or improvements thereto, during the term of Schedule 2 and within three years of termination of Schedule 2.

73.     TENA is entitled to permanent injunctive relief against Ellie Mae's further breach of the parties' contractual agreement.

74.     As a direct and proximate result of Defendant Ellie Mae's breach of contract, TENA has sustained economic losses and is entitled to compensatory damages in an amount to be proven at trial.

## CLAIM II: UNJUST ENRICHMENT

75.     TENA incorporates paragraphs 1 through 74 as if alleged fully herein.

76.     To the extent that any portion of the parties' contractual agreement may be found invalid or unenforceable, and a portion of the contract does not control between the parties or provide necessary relief, TENA is also entitled to equitable relief or entitled to it in the alternative.

77.     Ellie Mae has knowingly received a benefit to which it is not entitled. Namely, after reaping the benefits of the contractual agreement between the parties for many years, Ellie Mae has refused to honor and now seeks to invalidate certain of its promises not to issue a competing or similar product to ReportBuilder. These promises were an important part of the consideration offered to TENA. Ellie Mae attempts to receive more than the benefit of its bargain.

78.     It would be unjust for Ellie Mae to retain the benefit that it has received due to and in light of its conduct as alleged herein.

79.     In equity and good conscience, Ellie Mae is liable to TENA in an amount to be proven at trial arising out of Ellie Mae's unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TENA Companies, Incorporated pray for entry of a judgment against Ellie Mae as follows:

1.     Finding that Ellie Mae breached its contractual agreements with TENA;

2.      Finding that Ellie Mae was unjustly enriched at the expense of TENA to the extent not otherwise granted relief under other theories;

3.      Enjoining Ellie Mae from breaching its contractual agreements with TENA, including enjoining Ellie Mae from issuing a product that competes with or is similar to ReportBuilder and that was not developed, sold, or otherwise provided in a manner that is independent and distinct from that of the AllRegs brand of products and services; enjoining Ellie Mae from issuing a product that competes with or is similar to ReportBuilder under the AllRegs Brand through April 1, 2024; and enjoining Ellie Mae from using "products or software code" of AllRegs that was in existence immediately prior to the consummation of Ellie Mae's acquisition of AllRegs's interests in the General Services Agreement, or any reasonable extensions and/or improvements thereto that occurred after consummation of said acquisition.

4.      Awarding TENA all damages suffered by TENA as a result of Ellie Mae's wrongdoing, enhanced where permissible;

5.      Awarding exemplary damages for willful and malicious conduct;

6.      Awarding attorneys' fees and costs, where permissible;

7.      Adding pre- and post-judgment interest on all sums awarded; and

8.      Granting all such other and further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

TENA requests a trial by jury on any and all issues on which a trial by jury is available under applicable law.

Dated: June 7, 2021

ROBINS KAPLAN LLP

By: _____

Sylvia R. Ewald
SEwald@RobinsKaplan.com

800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Telephone:    612 349 8500
Facsimile:     612 339 4181

Attorneys for Plaintiff
TENA Companies, Inc.

## ACKNOWLEDGMENT REQUIRED BY MINN. STAT. § 549.211, SUBD. 2

The undersigned hereby acknowledges that, pursuant to Minn. Stat. § 549.211, subd. 2, costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the court.

Dated: June 7, 2021

ROBINS KAPLAN LLP

By: _____
Sylvia R. Ewald
SEwald@RobinsKaplan.com

800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Telephone:   612 349 8500
Facsimile:    612 339 4181

Attorneys for Plaintiff
TENA Companies, Inc.

# Exhibit A

# GENERAL SERVICES AGREEMENT

**THIS GENERAL SERVICES AGREEMENT** (the "Agreement") is made and entered into as of February 1, 2005, by and between Mortgage Resource Center, Inc. ("AllRegs"), a Minnesota corporation doing business as AllRegs, with offices at 1020 Discovery Road, Suite 180, Eagan, MN 55121 and TENA Companies, Inc. ("TENA"), a Minnesota corporation with offices at 251 West Lafayette Frontage Rd. S., St. Paul, MN 55107.

**WHEREAS,** AllRegs owns and markets an online information system containing mortgage lending guidelines, regulations and statutes under the trade name of AllRegs®; and

**WHEREAS,** TENA owns and markets a Quality Control Audit Outsourcing Service, SecondLook® Software, a audit software application and InfoBureau Services®, a background investigation service; and

**WHEREAS,** AllRegs wishes to engage TENA, and TENA desires to be engaged, to provide certain products and services in connection with the products of AllRegs, and

**WHEREAS,** AllRegs and TENA may now or in the future, engage in the joint development, marketing and/or delivery of products and/or services for current and prospective clients of both companies.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual agreements, promises and covenants contained herein, AllRegs and TENA agree as follows:

1. **Specific Products and Services.** Subject to the terms and conditions of this Agreement, TENA shall provide various products and services to AllRegs. The schedule, process, form, compensation plan and other pertinent details relevant to a specific product and/or service will be outlined on a specific products and services schedule (the "Schedule"). Schedules will be numbered sequentially beginning with #1 and each Schedule may have separate and unique terms from the other Schedules. Schedule number one (1) attached hereto and incorporated herein by reference outlines the analysis and commentary services TENA will provide to AllRegs (the "State Analysis and Commentary Services"). Details relating to additional products or services will be outlined, as needed, on Schedules numbered subsequent to Schedule 1, which upon execution by both parties and by appropriate reference, will also be made a part of this Agreement. TENA shall perform and deliver the State Analysis and Commentary Services to AllRegs in accordance with the schedule, process, format and compensation plan set forth on Schedule 1. TENA shall perform and deliver additional products and/or services in accordance with the schedule, process, format and compensation plan set forth on the applicable Schedules outlining said additional product or service and executed in accordance with this Section.

2. **No Competing Work.**
   a) Each party agrees to keep all content and/or products it provides to the other party clear of any claims, liens and encumbrances.

   b) Each party agrees that for so long as a governing Schedule pertaining to a product or service is in effect, neither party, without the written consent of the other will modify, translate, de-compile, nor create or attempt to create, by reverse engineering or otherwise,

the proprietary systems, services, output, or content provided by the other party with the intent of creating a derivative work to supplant the services, output or content provided by the other party or which would in any manner tend to impair current and/or future revenues attributable to products, content, or services covered under this Agreement or an active Schedule.

**3.    Trade Secret Information.**

a)    As used herein, "trade secret information" means any information or compilation of information pertaining to one party, possessed by the other party, or developed by the other party or any employee or contractor thereof in the course of their work under this Agreement, which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.  Without limiting the generality of the foregoing, "trade secret information" includes: (i) information concerning either party's management, financial condition, financial operation, purchasing activities, pricing formulas, existing and contemplated products and services, sales activities, marketing research, marketing plans, marketing activities, and business plans and relationships; (ii) all ideas, procedures, processes, systems, methods of operation, concepts, formulas, algorithms, techniques, processes, designs, specifications, diagrams, flow charts, manuals, descriptions, instructions, and other non-public information developed for either party; and (iii) the nature of the work performed under this Agreement and the terms of this Agreement.  However, "trade secret information" does not include information about either party which was known to the personnel of one party prior to its receipt from or development for the other party, information which is generally known or available to the public, information which is disclosed by one party to the other party without restriction, or information which would not qualify as trade secret information under Minnesota law.

b)    Except as required in the course of its work under this Agreement, neither party will use or disclose to any third party any trade secret information relating to the other party.  Neither party will disclose any trade secret information about the other party to any of its agents or employees who do not have a need to know in order to complete their responsibilities relative to the provisions of this Agreement and its associated schedules.

c)    Each party agrees to secure and protect the trade secret information of the other party in a manner consistent with the maintenance and security of its own most valuable trade secret information and to take appropriate action, by instruction or agreement, with all persons who are permitted access to the trade secret information to satisfy its obligations hereunder.  Each party acknowledges that it will be in receipt of trade secret information of the other party and hereby agrees to maintain the confidentiality thereof using the same degree of care as it uses to maintain the confidentiality of its own, similar confidential information.  In the event of an actual or threatened breach of the provisions of this section, the offended party shall be entitled to an injunction restraining the offending party there from. Nothing herein shall be construed as prohibiting the offended party from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from the offending party. All obligations of confidentiality and nondisclosure shall survive the termination of this Agreement.

2589115v7

4.   **Representations, Warranties and Indemnification.**

   a)   **Representations and Warranties.** Each party represents and warrants that (i) it has the right to enter into this Agreement and is free of any obligation or restriction that would prevent it from entering into this Agreement or impede its performance hereunder; (ii) each party has the right to assign the rights herein assigned and said rights are not subject to any prior agreement, lien or other claims or rights; (iii) except for components already in the public domain, all content to be furnished hereunder, in whole or in part, by either party to the other party will not infringe upon or otherwise violate any copyright, patent, trademark, trade secret, right of privacy or publicity or other proprietary right of any person or entity.  These representations and warranties shall survive termination of this Agreement.

   b)   **Indemnification.** Each party agrees to indemnify, defend and hold harmless the other party, its directors, officers, employees, and assigns against all losses, claims, liabilities, judgments, awards, settlements, damages and costs (including, but not limited to, legal fees and expenses), arising out of or relating to any breach by the other party of any of its representations, warranties, agreements, or covenants in this Agreement or in any Schedule, or resulting from, arising out of or connected to any claim of inaccuracy of the content provided by either party to the other party.  Each party will, at its own expense, defend, or at its option settle, any action brought against the other party pursuant to the above provided that the indemnified party promptly notifies the indemnifying party in writing of any such claim and, provided further, that the indemnifying party shall have the exclusive right to control such defense or settlement. In no event shall the indemnified party settle any such claim, lawsuit or proceeding without the indemnifying party's prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed), unless such settlement requires no admission of liability on the part of the indemnified party and no assumption of any obligation or monetary payment for which the indemnified party has not been fully indemnified.

5.   **Term of Agreement; Termination.**

   a)   **General.** The parties agree that this Agreement shall commence on the date first set forth above and shall continue in full force and effect until the last active Schedule related to this Agreement expires or is terminated in accordance with the terms of such Schedule.

   b)   **Termination of a Schedule:** Termination of a Schedule by one party will be handled in accordance with the specific termination provisions outlined on the subject Schedule. Each party agrees that each Schedule must be terminated independent of all other Schedules and that the termination of any one or more Schedules shall have no impact on the surviving Schedules.

6.   **Non-Solicitation.** During the term of this Agreement and for a period of one (1) year following the expiration or termination of this Agreement, neither party will, directly or indirectly, solicit, contact or communicate with any employee or contractor of the other party with the intent of employing or contracting with such person for such party's benefit; provided, however, that a general advertisement to the public regarding employee or contractor positions shall not be deemed to be a violation of this Section.

2589115v7

7.  **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE AND/OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY SCHEDULES OR THE SUBJECT MATTER HEREOF, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. NOTWITHSTANDING THE FOREGOING, IN THE EVENT A PARTY INTENTIONALLY OR THROUGH GROSS NEGLIGENCE BREACHES THE PROVISIONS OF PARAGRAPH 3(c) HEREIN, SUCH LIMITATION OF LIABILITY WILL NOT APPLY.

8.  **Notice.** Any notice required or permitted under this Agreement will be in writing and will be deemed to have been duly given or served when delivered personally or sent by registered or certified first-class U.S. mail, postage prepaid, or by commercial expedited delivery service, addressed to the respective addresses of the parties set forth herein or such other addresses as either party may hereafter designate in writing.

9.  **Relationship of the Parties.** Unless specifically stated in a Schedule, nothing in this Agreement shall be construed as creating any joint venture, partnership, employment or agency relationship between the parties for any purpose whatsoever or as constituting either party as the legal representative, guarantor, surety, employee or agent of the other. Neither party shall have the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against or in the name of or on behalf of the other.

10. **Non-waiver and Accumulation of Remedies.** The failure by either party at any time to enforce any of the provisions of this Agreement or any right or remedy available hereunder or at law or in equity, or to exercise any option herein provided, shall not constitute a waiver of such provision, right, remedy or option or in any way affect the validity of this Agreement. The waiver of any default by either party shall not be deemed a continuing waiver, but shall apply solely to the instance to which such waiver is directed. Except as expressly provided herein, all remedies available to either party for breach of this Agreement or at law or in equity are cumulative and may be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed an election of such remedy to the exclusion of other remedies.

11. **Assignment.** Either party may assign this Agreement to a successor to all or substantially all of such party's business, provided: a) notification of intent to assign is provided to the non-assigning party at least 90 days prior to the proposed effective date; b) the non-assigning party agrees in writing to the transfer to the proposed assignee; and c) the proposed assignee agrees in writing to be bound by all of the terms and conditions hereof, including all Schedules, hereto. The non-assigning party's agreement to such assignment shall not be unreasonably withheld. Each party acknowledges, however, that it is reasonable for the non-assigning party to withhold such approval if in the opinion of the non-assigning party, a) the assignee or its affiliates compete in business in any manner with the non-assigning party, or b) the non-assigning party reasonably believes that monetary loss and/or a compromise of the non-assigning party's proprietary processes or intellectual property could result from the transfer of the Assignor's rights under the Agreement. If the non-assigning party withholds acceptance of a proposed assignment and the Assigning party proceeds with such assignment, the non-assigning party may terminate all additional work outlined by this Agreement and its Schedules effective as of the date of assignment by providing the Assigning party sixty (60) days advance written notice.

2589115v7

12. **Binding Effect and Benefit.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13. **Governing Law and Venue of Disputes.** This Agreement shall in all respects be governed by and interpreted, construed and enforced in accordance with the laws of the State of Minnesota, without regard to conflict of laws provisions thereof. Any dispute arising under this Agreement shall be venued in a state or federal court situated within the State of Minnesota, and the parties hereby irrevocably submit themselves to the personal jurisdiction of said courts for that purpose.

14. **Construction.** Every provision of this Agreement shall be construed, to the extent possible, so as to be valid and enforceable. If any provision of this Agreement so construed is held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision shall be deemed severed from this Agreement, and all other provisions shall remain in full force and effect.

15. **Final Authority:** In the event of a discrepancy between the provisions of this Agreement and any accompanying Schedule, the terms of the Schedule shall prevail.

16. **Entire Agreement.** This Agreement, including Schedule 1 and any other subsequent Schedules and any related exhibits to which express reference is made herein, sets forth the entire agreement and understanding of the parties regarding the subject matter hereof and supersedes all prior representations, statements, proposals, negotiations, discussions, understandings and/or agreements regarding the same subject matter. This Agreement may not be modified or amended except by a writing signed by both parties.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

Mortgage Resource Center, Inc. d/b/a AllRegs

By _____

Its _____President_____

TENA Companies, Inc. d/b/a TENA

By _____

Its _____C EO_____

2589115v7

## SCHEDULE 1 TO GENERAL SERVICES AGREEMENT

### State Analysis and Commentary Services

This Schedule 1, dated February 1, 2005, is incorporated into and forms a part of the General Services Agreement dated February 1st, 2005, by and between Mortgage Resource Center, Inc., a Minnesota corporation doing business as AllRegs ("AllRegs") and TENA Companies, Inc., a Minnesota corporation ("TENA").

1.   **Services.** AllRegs's existing online state regulatory interpretation compliance product is known as the State Analysis and Commentary. It provides analysis and commentary relative to pertinent mortgage lending statutes and regulations promulgated by fifty U.S. States, the District of Columbia, Puerto Rico, the Virgin Islands and any other U.S. Territories designated by AllRegs for inclusion in the State Analysis and Commentary. AllRegs shall give notice to TENA when AllRegs adds such additional jurisdictions. TENA shall provide the following services listed in 1 (a) through 1 (f) of this paragraph (hereinafter the State Analysis and Commentary Services) to support the accuracy and completeness of AllReg's State Analysis and Commentary product. The primary purpose of the State Analysis and Commentary Services to be to be provided by TENA is to summarize statutes and regulations while preserving their meaning and intent yet, as much as is reasonably possible, to write the text contained in the A & C Work (as defined in Section 3(a) below) so that it will be understandable to the non-lawyer, mortgage professional, reader.  Said services are listed in the order of importance and therefore, the order in which they should be addressed by TENA.

   a)   Provide a brief, condensed and succinct "news release" type statement summarizing the relevant enactments and/or changes to a statute or regulation for use in AllReg's State Compliance Summaries, including, but not limited to, its "Weekly Digest" and "Daily Alert" communiqués', (hereinafter "Summary").

   b)   Write new content to cause the State Analysis and Commentary to reflect recently enacted mortgage lending related statutes and/or regulations from all of the Jurisdictions.

   c)   Revise existing State Analysis and Commentary content to reflect pertinent, mortgage lending related, statutory and/or regulatory modifications that are made within any of the Jurisdictions.

2589115v7

1

   **d)**     Make editorial corrections to State Analysis and Commentary as AllRegs may reasonably request.

   **e)**     Make editorial corrections to State Analysis and Commentary when the need for such correction is identified by TENA.

   **f)**     Should statutes or regulations be enacted before their official effective date, prominent statements indicating the applicable effective date for that portion of the A & C Work will be included in the A & C Work.

**2.**   **Representations and Warranties.** TenA represents and warrants to AllRegs that (i) it will make its best efforts to ensure the information and data contained in the A & C Work is accurate when delivered; (ii) except for components already in the public domain, all content in the A & C Work to be furnished by TenA hereunder will be original, will have been developed specifically for the fulfillment of this Agreement and has not previously been published; and (iii) the A & C Work, in whole or in part, will not infringe upon or otherwise violate any copyright, patent, trademark, trade secret, right of privacy or publicity or other proprietary right of any person or entity. These representations and warranties shall survive termination of this Schedule.

**3.**   **Works of Authorship.**

   **a)**     All content and material prepared or compiled by TENA for incorporation into the State Analysis and Commentary, including without limitation all new material, all updates, upgrades, artwork, electronic content, design, illustrations, text or other material prepared, compiled and/or delivered by TENA, in connection with TENA's performance of the State Analysis and Commentary Services is referred to herein as the "A & C Work".

   **b)**     AllRegs is and shall be the sole copyright owner of the State Analysis and Commentary and all A & C Work and all portions thereof, including without limitation all copyrightable matter prepared or provided by TENA in the course of its performance hereunder. Without limiting the generality of the foregoing, TENA hereby irrevocably assigns, conveys and transfers to AllRegs, free and clear of any lien or other encumbrance, the sole and exclusive right, title and interest in and to the ownership and copyright of all copyrightable subject matter prepared, generated or created by TENA or its employees in the course of its performance hereunder, including but not limited to any and all compilations of information made, generated or created in the course of TENA's performance hereunder, including all right to copyright the A & C Work in the United States or anywhere throughout the World, in AllRegs's name or otherwise for AllRegs's sole benefit, and to secure renewals or extensions of such copyrights in AllRegs's name or otherwise. Accordingly, TENA agrees to execute such further instruments as AllRegs may request to evidence, establish, maintain or protect its rights in and ownership of the A & C Work, and TENA agrees to assist AllRegs, at AllRegs's expense, to perfect and/or register, to obtain extensions and renewals thereof, and

from time to time to enforce, all copyrights and protections relating to the A & C Work, including, without limitation, to execute and deliver all documents requested by AllRegs in connection therewith. In the course of performing hereunder, TENA will include within and affix upon the A & C Work such copyright and other proprietary notices as AllRegs may request.

c)   **AllRegs's Rights and Discretion with Respect to the A & C Work**. TenA acknowledges and agrees that AllRegs shall have the sole and exclusive right throughout the universe in perpetuity to use and exploit all or any part of the A & C Work and all or any part of any material contained therein or prepared therefore, whether or not used therein, in any language, in any format or version, by any means and in any media, now known or hereafter discovered, and the sole and exclusive right to license these rights to others. AllRegs shall have the right, in its sole discretion and without limitation, to make, at any time, any changes, additions, deletions, abridgment and/or condensation whatsoever in the content of the A & C Work and to determine the date of publication, manner and style, title, price, all advertising, promotions, publicizing, marketing, distribution, licensing and other decisions with regard to the A & C Work. AllRegs shall have no obligation to publish or license the A & C Work.

d)   **No Competing Work.** AllRegs acknowledges that TENA produces statutory and regulatory references for use in various products including its *SECONDLOOK Software* applications and couples them with hot links to AllRegs web online services and further acknowledges that such work does not constitute competing work. TENA agrees that as long as the schedule remains in effect and for a period of twenty-four (24) months after the expiration or termination of this schedule, it will not, without the written consent of AllRegs, publish, sell or license, or contract to publish, sell or license, or furnish to any other publisher or other person for publication, sale, license or other use, in any form whatsoever, the A & C Work, or similar works which cover the same or substantially the same subject matter of the A & C Work and would tend to impair sales of licenses in the A & C Work or AllRegs's rights under this Agreement.

4.   **Procedural Flow and Responsibilities of Parties.**

a)   **Monitor changes.** The responsibility for identifying mortgage lending based statutory and/or regulatory changes for possible modification, inclusion or exclusion in the Analysis and Commentary rests with AllRegs who, through various subscriptions and monitoring protocols such as StateNet (or alternative resources) will identify when such changes occur. As a backup to AllRegs efforts, TENA will maintain various subscriptions and monitoring protocols such as WestLaw and the associated WestLaw Links system and utilize its best efforts to identify mortgage lending based statutory and/or regulatory changes for possible modification, inclusion or exclusion in the Analysis and Commentary.

2589115v7

**b)** **Notification of Changes.** Not later than 2:00 P.M., each Tuesday and Thursday, (or on an alternative schedule mutually agreed to in writing by the parties), AllRegs will alert TENA whether any of the Jurisdictions have made any statutory or regulatory changes that may potentially need to be reflected in the Analysis and Commentary. In addition, AllRegs will provide TENA with the relevant web address (or link) from which the statutory/regulatory changes can be retrieved. Said notice will be made to the head of TENA's Compliance Division or other recipient designated in writing by TenA. AllRegs will always send such notice at the designated times even if the there is no information to report. In the event TENA staff members identify a statutory or regulatory change not provided by AllRegs that necessitates a change to the Analysis and Commentary, TENA will initiate the applicable A & C Work as though it had been notified by AllRegs and will provide the designated AllRegs contact person with the applicable details.

**c)** **The Review Process.** Upon receipt of notification of a possible change in a mortgage lending based statute and/or regulation, TENA will perform the following steps.

    **i.** If upon receipt of notification of a possible change, TENA ascertains that the change does not affect the Analysis and Commentary, then that determination will be promptly communicated in writing to the applicable contact at AllRegs.

    **ii** If upon receipt of notification of a possible change, TENA ascertains that the change will affect the Analysis and Commentary, then the A & C Work will be initiated. Such work will consist of reading and analyzing the applicable statutory and/or regulatory materials; writing an analysis and commentary outlining the core provisions and salient details of the material; and preparing the Summary, all as outlined in Section 1 herein. Lastly, TENA will identify by reference number the statutes and/or regulations (or sections thereof) that AllRegs must republish to bring the published materials up to date with the latest changes.

**d)** **Delivery of the A & C Work.** Upon completion of its A & C Work, TENA will deliver to AllRegs, in an electronic format via e-mail, a copy of each component of the A & C Work.

**e)** **Reasonable Timeliness.** Both parties acknowledge that the review process described above must be completed by TENA in a reasonably timely manner. For purposes of this work, reasonable timeliness shall mean that TENA will use its best efforts to complete the required work as quickly as other work requirements under the scope of this Schedule will permit. It is understood and acknowledged by both parties that reasonable timeliness during periods of low legislative activity may encompass as little as two or three business days while reasonable timeliness during periods of high legislative activity or legislative activity that produces prodigious amounts of statutory or regulatory material for review, may

2589115v7

encompass several weeks. In the event circumstances extend TENA'S completion time for A & C Work beyond a few days time period, TENA will comply with Paragraph 1(a) herein by accelerating the issuance of the Summaries and delivering said Summaries to AllRegs within a few days of receiving initial notifications of change. AllRegs acknowledges that in the event such Summaries are accelerated prior to completion of all related A & C Work, they may require subsequent revision which will be provided by TENA as necessary. Subject to variances that are the result of routine employee turnover, TENA agrees to maintain staff levels adequate to handle average levels of work-load that are generated from this Schedule and to give Schedule related work priority over other non-Schedule related work. During periods of high work-loads, TENA will strive to keep its work turn-around time as short as possible but both parties acknowledge that the concept of reasonable timeliness will be extended to reflect the volume and scope of work then at hand. AllRegs acknowledges and agrees with this work balancing plan.

5.   **Term of Schedule 1.**  The parties agree that this Schedule shall remain in full force and effect for the period commencing on the date first set forth above and ending on December 31, 2007, unless earlier terminated as provided in Section 9 (b) hereof. This Schedule shall thereafter be automatically renewed on the first day of January of each year in successive one year terms and shall continue in full force and effect unless terminated as provided in Section 9 (a) or Section 9 (b) herein.

6.   **Fees and Compensation.**  As full compensation for the State Analysis and Commentary Services provided hereunder and the rights with respect to the A & C Work granted and assigned herein, AllRegs shall pay TenA as follows:

a)   **Fees and Royalties.**
   i.   During the term of this Schedule, AllRegs shall pay to TENA a quarterly royalty determined as follows:

   a)   From February 1, 2005 through January 31, 2006, an amount equal to twelve percent (12%) of AllRegs's Gross Receipts received from licensing of the Subscriber Version of the State Analysis and Commentary product.

   b)   From February 1, 2006 through January 31, 2007, an amount equal to ten percent (10%) of AllRegs's Gross Receipts received from licensing of the Subscriber Version of the State Analysis and Commentary product.

   c)   On February 1, 2007, and thereafter, unless otherwise changed by a writing signed by both parties, an amount equal to ten percent (10%) of AllRegs's Gross Receipts received from licensing of the Subscriber Version of the State Analysis and Commentary product.

2589115v7

**d)**   As used herein, "Gross Receipts" shall mean the gross cash actually received by AllRegs during the Contract Quarter (as defined below) from licensing of the Subscriber Version of the State Analysis and Commentary Product. "Subscriber Version" means any version of the State Analysis and Commentary Product that is made available to paid subscribers of AllRegs; provided, however, that 16.83% of the revenue received by AllRegs for licensing of each Single Family Package (which includes one state for the State Analysis and Commentary product) shall be included in Gross Receipts.

**ii.**   No royalties shall be payable for licenses of the State Analysis and Commentary product furnished free of charge by AllRegs to third-parties for review, advertising, sample or like purposes, or for complimentary subscriptions to any subscriber of AllRegs.

**b)   Payments and Accounting.**

**i.**   As used in this Agreement, "Contract Quarter" shall mean a period of three (3) months commencing on the first day of January, April, July and October of each year and ending on the last day of each such designated calendar quarter, provided, however, that the first Contract Quarter shall consist of fewer than three (3) full months and shall commence on February 1, 2005 and end on March 31, 2005. By the 21st day of the month subsequent to the last day of a calendar quarter, AllRegs shall pay to TENA all royalties earned through the end of the proceeding calendar quarter.

**ii.**   Along with each payment, AllRegs shall prepare and deliver to TENA a statement accounting for Gross Revenues during the applicable calendar quarter. Upon fourteen (14) days written notice, and no more than twice each Contract Year, a representative of TENA skilled in accounting and acceptable to AllRegs, or a certified public accountant hired by TENA, may examine the books and records of AllRegs which relate solely to the services provided by TENA under the provisions of this Schedule 1. Such examination shall be at AllRegs's principal place of business, during usual business hours, and at TENA's expense. Any statement provided hereunder shall be binding on TENA if no objection to the statement is provided to AllRegs in writing within one (1) year of issuance of the statement unless subsequent investigation or inquiry indicates that deliberate malfeasance or misrepresentation on the part of AllRegs is likely to have occurred in which case the time provided for TENA to make an objection to a statement shall automatically be extended to three (3) years.

**7.   Timely Delivery.**   Timely delivery of the A & C Work is of the essence in this Agreement. If TENA fails to deliver any portion of the A & C Work in a reasonably

2589115v7

timely manner as provided in Section 4(e) hereof, as determined in AllReg's sole discretion, such failure shall constitute a material breach of this Schedule, the remedy for which is provided in Section 9(b) herein. Should AllRegs terminate this Schedule due to TENA's breach of this Timely Delivery provision, AllRegs shall calculate the Fees and Royalties due TENA through the date that AllRegs notified TENA of the material breach.

8.  **Quality Work.** If any portion of TENA'S A & C Work, at any time, is not, in AllRegs's sole judgment, satisfactory, AllRegs may, in addition to any other rights and remedies under this Agreement, notify TENA that such portion of the A & C Work is not satisfactory and request TENA to make such editorial changes in the A & C Work as AllRegs deems necessary in order to make it suitable for publication. If TENA agrees to make such changes, TENA shall do so within thirty (30) days after AllRegs's request. TENA shall not be entitled to any additional compensation therefore. If TENA refuses or fails to make such changes to the satisfaction of AllRegs, such failure shall constitute a material breach of this Schedule, the remedy for which is provided in Section 9(b) herein. Should AllRegs terminate this Schedule due to TENA's breach of this Quality Work provision, AllRegs shall calculate the Fees and Royalties due TENA through the date that AllRegs notified TENA of the material breach.

9.  **Termination Provisions.**
    a)   **Standard Termination Provisions.**
         Either party may terminate this Schedule 1 at any time upon at least two calendar quarters written notice to the other party, said notice to be made effective on January 1, April 1, July 1 or October 1. Not later than the 21st day of the month subsequent to the termination date, AllRegs shall make a final reconciliation of fees due under this Schedule and pay TENA any final fees then due TENA. In the event the final reconciliation indicates that TENA has been overcompensated for its work and that a refund is due to AllRegs, TENA shall make such payment to AllRegs within ten (10) days of receipt of the final reconciliation from AllRegs.

    b)   **Accelerated Termination Provisions.**
         Either party may terminate this Schedule 1 immediately, upon written notice to the other party, in the event that the other party: i) breaches a material provision of either the Agreement or this Schedule and fails to cure such breach within thirty (30) days of written notice demanding a cure for such breach; ii) ceases to conduct business in the ordinary course of business; iii) is adjudged bankrupt or is placed in the hands of a receiver, makes an assignment for the benefit of creditors, or takes the benefit of any insolvency act.

    c)   **Rights to A & C Work After Termination.**
         TENA agrees and acknowledges that upon termination of the Agreement for any reason, AllRegs shall continue to have, in accordance with Section 3 of this Schedule, the sole and exclusive right, title and interest in and to the ownership and copyright of the A & C Work and any and all portions thereof.

2589115v7

7

10.     **Actions After Termination.**  In the event of termination of this Schedule 1 for any
        reason, TENA will deliver to AllRegs, within fifteen (15) days of termination, all A & C
        Work prepared for inclusion in the State Analysis and Commentary.  Termination of this
        Agreement shall not affect AllRegs's obligation to account for and pay to TENA any
        compensation due through the earlier of the effective date of termination or the date of
        AllRegs' notice to TENA of TENA'S material breach.

**IN WITNESS WHEREOF,** the parties have executed this Schedule as of the date first above
written.

Mortgage Resource Center, Inc. d/b/a AllRegs          TENA Companies, Inc. d/b/a TENA

By _____          By _____

Its _____          Its _____

2589115v7

8

# Exhibit B



## Schedule 2 to General Services Agreement

### State Compliance ReportBuilder

This Schedule 2 to the General Services Agreement (this "Schedule 2"), dated February 28, 2006, is incorporated into and forms a part of the General Services Agreement (the "GSA") dated February 1st, 2005, by and between Mortgage Resource Center, Inc., a Minnesota corporation doing business as AllRegs ("AllRegs") and TENA Companies, Inc., a Minnesota corporation ("TENA").

**WHEREAS,** AllRegs wishes to develop and market a state compliance based, query product (hereinafter "State Compliance ReportBuilder") as a web-based application that works in conjunction with AllRegs' online mortgage lending guidelines, regulations and statutes information system that is currently marketed under the trademark AllRegs®; and

**WHEREAS,** TENA has extensively researched and summarized state laws pertaining to a variety of mortgage compliance topics for all 50 states, the District of Columbia and certain US Territories, and has compiled the information into specific categories and topics;

**WHEREAS,** AllRegs and TENA are desirous of utilizing TENA'S Matrix Content, as defined below, as the data portion of the State Compliance ReportBuilder product;

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual agreements, promises and covenants contained herein, AllRegs and TENA agree as follows:

1. **Definitions:**

    a. State Compliance ReportBuilder – The end product contemplated herein, that allows a user to build a query by selecting (i) one or more of the 50 states, the District of Columbia and those US Territories identified on Exhibit A attached hereto (collectively, the "Jurisdictions"), and (ii) categories and/or topics related to Residential Mortgage Lending Statutes and Regulations (as defined more fully in Exhibit A), and generate a report based on the data contained in the Matrix Content.

    b. Matrix Content – The compilation created, updated and maintained by TENA, which consists of information relating to Residential Lending Statutes and Regulations for the Jurisdictions, and is organized according to specific categories and topics that include those listed in Exhibit A attached hereto, and any additional categories and/or topics that may from time to time be mutually agreed upon by both parties. The Matrix Content contains several thousand data points of information, each of which is a synopsis of a specific category or topic relating to Residential Lending Statutes and Regulations pertaining to one territory, state or jurisdiction within a state or territory.

    c. Matrix Work – Services to be provided by TenA under this Schedule 2, the primary purpose of which is to prepare the Matrix Content so that it significantly

summarizes statutes, regulations and other miscellaneous data elements while preserving their meaning and intent yet, as much as is reasonably possible, to write the text contained in the Matrix Content so that it will be understandable to the non-lawyer, mortgage professional, reader, in the following manner:

    i. Write new content to cause the Matrix Content to reflect recently enacted mortgage lending related statutes and/or regulations from all of the Jurisdictions.

    ii. Revise existing Matrix Content to reflect pertinent, mortgage lending related, statutory and/or regulatory modifications that are made within any of the Jurisdictions.

    iii. Make editorial corrections to Matrix Content as AllRegs may reasonably request or when the need for such correction is identified by TENA.

    iv. Should statutes or regulations be enacted before their official effective date, TENA will suspend incorporation into the States Compliance Matrix until the effective date.

d. State Compliance Matrices – All Matrix Content and Matrix Work prepared or compiled by TENA for incorporation into the State Compliance ReportBuilder, including without limitation all new material, all updates, upgrades, art work, electronic content, design, illustrations, text or other material prepared, compiled and/or delivered by TENA, in connection with TENA's performance of work under this Schedule 2.

e. Matrix Database Maintenance Tool – The software application designed and developed by TenA which facilitates the maintenance, organization, tracking and uploading of the Matrix Content to a File Transfer Protocol (FTP) site, or similar share point.

f. User Interface – The web based software application designed and developed by AllRegs which allows the user to easily access the Matrix Content in such a way as to permit quick access to single data points, custom queries for comparing multiple data points, the saving of past queries, report generation in a variety of formats and linking to the State Analysis and Commentary (as defined in Schedule 1 to the GSA).

g. State Analysis and Commentary – An AllRegs product providing on-line summarization and interpretation of state regulatory compliance information relative to pertinent mortgage lending statutes and regulations promulgated by fifty U.S. States, the District of Columbia, Puerto Rico, the Virgin Islands and other U.S. Territories.

2. **Services.** TENA'S State Compliance Matrices will cover pertinent mortgage lending statutes and regulations promulgated by the fifty U.S. States, the District of Columbia, and any other U.S. Territories designated by AllRegs and will enhance or supplement AllRegs' State Analysis and Commentary product. TENA will provide the State Compliance Matrices to be

used in AllRegs's State Compliance ReportBuilder product. AllRegs' State Compliance ReportBuilder product will be a web-based application that works in conjunction with TENA's State Compliance Matrices and will enable AllRegs' subscribers to write queries that provide succinct answers to select state compliance topics.

    a. AllRegs shall provide, at AllRegs sole and exclusive expense, all software development and maintenance of the User Interface required in conjunction with the marketing and delivery of the State Compliance ReportBuilder product. AllRegs shall bear responsibility for all expenses relating to the distribution of the State Compliance ReportBuilder product, including but not limited to its publication, advertising, promotions, publicizing, marketing, distribution, licensing and other such decisions with regard to the ReportBuilder Product.

    b. TenA shall provide, at TenA's sole and exclusive expense, all costs associated with the Matrix Work and the creation of the Matrix Content.

    c. TENA shall provide, at TENA'S sole and exclusive expense, any and all software development and maintenance required for the Matrix Database Maintenance Tool used in conjunction with developing, organizing, maintaining, updating, editing, and transmitting updates of all State Compliance Matrices to AllRegs.

    d. TENA and AllRegs shall mutually confer on the subscription price or other charges that will be assessed by AllRegs to users of the State Compliance ReportBuilder. AllRegs' shall maintain the exclusive right to establish pricing, however, AllRegs' shall not dilute or undercut the value of the State Compliance ReportBuilder such that the net result is a material diminishment of income sharing to TenA.

    e. TENA shall have the right, in its sole discretion and without limitation, to make, at any time, any changes, additions, deletions, abridgment and/or condensation whatsoever in the State Compliance Matrices. This provision notwithstanding, TenA must act in good faith and for the benefit of the product at all times and can not make changes or consolidation to the matrix content such that the usefulness or commercial viability of the product is diminished.

3. **Grant of Rights.** TENA hereby grants to AllRegs for the duration of the term of this Schedule 2 an exclusive license throughout the world to reproduce, transmit, communicate, display, distribute and permit others to access and use the State Compliance Matrices as part of the State Compliance ReportBuilder.

4. **Representations and Warranties.** TENA represents and warrants to AllRegs that (i) it will make its best efforts to ensure the information and data contained in the State Compliance Matrices is accurate when delivered; (ii) except for components already in the public domain, all content in the State Compliance Matrices to be furnished by TENA hereunder will be original and will not have been previously published in any context except as they may have been published by TENA in conjunction with a TENA based product and/or service; and (iii) the State Compliance Matrices, in whole or in part, will not infringe upon or otherwise violate any copyright, patent, trademark, trade secret, right of privacy or publicity or other proprietary right of any person or entity. These representations and warranties shall survive termination of this Schedule.

5. **Ownership.**

   a. AllRegs acknowledges and agrees that TENA owns all right, title and interest in and to the State Compliance Matrices and the Matrix Database Maintenance Tool, including all rights to copyright the Matrix Content and Matrix Work in the United States or anywhere throughout the World, in TENA'S name or otherwise for TENA'S sole benefit, and to secure renewals or extensions of such copyrights in TENA'S name or otherwise, and that, except pursuant to and as provided in Section 14(c), nothing in this Schedule 2 shall confer in AllRegs any right of ownership therein. In the course of performing hereunder, TENA will include within and affix upon the State Compliance Matrices copyright and other proprietary notices it feels necessary to preserve its interests in the Matrix Content and Matrix Work.

   b. TENA acknowledges and agrees that AllRegs owns all right, title and interest in and to the State Analysis and Commentary, the AllRegs web site, the State Compliance ReportBuilder developed by AllRegs in connection herewith, and the User Interface, that nothing in this Schedule 2 shall confer in TENA any right of ownership therein, and that no license is granted by AllRegs in this Schedule 2.

6. **No Competing Work.** AllRegs acknowledges that TENA produces statutory and regulatory references for use in various products including its *SECONDLOOK Software* applications and couples them with hot links to AllRegs web online services and uses various portions of the Matrix Content in conjunction with its own products and services. AllRegs further acknowledges that such work does not constitute competing work. TENA agrees that as long as this Schedule 2 remains in effect it will not, without the written consent of AllRegs, publish, sell or license, or contract to publish, sell or license, or furnish to any other publisher or other person for publication, sale, license or other use, in any form whatsoever, the Matrix Content and Matrix Work, or similar works which cover the same or substantially the same subject matter of the State Compliance Matrices and which would tend to impair sales of licenses in the State Compliance ReportBuilder Product or AllRegs' rights under this Schedule 2.

7. **Procedural Flow and Responsibilities of Parties.**

   a. **Monitor changes.** The responsibility for identifying mortgage lending based statutory and/or regulatory changes for possible modification, inclusion or exclusion in the Matrix Content rests with TENA who, through various subscriptions and monitoring protocols will identify when such changes occur. As a backup to TENA'S efforts, AllRegs will maintain various subscriptions and monitoring protocols such as StateNet and utilize its best efforts to identify mortgage lending based statutory and/or regulatory changes for possible modification, inclusion or exclusion in the Matrix Content.

   b. **Notification of Changes.** Not later than 2:00 P.M., each Tuesday and Thursday, (or on an alternative schedule mutually agreed to in writing by the parties), AllRegs will alert TENA whether any of the Jurisdictions have made any statutory or regulatory

changes that may potentially need to be reflected in the State Analysis and Commentary and the Matrix Content. In addition, AllRegs will provide TENA with the relevant web address (or link) from which the statutory/regulatory changes can be retrieved. Said notice will be made to the head of TENA's Compliance Division or other recipient designated in writing by TenA. AllRegs will always send such notice at the designated times even if the there is no information to report. In the event TENA staff members identify a statutory or regulatory change not provided by AllRegs that necessitates a change to the State Analysis and Commentary and Matrix Content, TENA will initiate the applicable Analysis & Commentary Work (as defined in Schedule 1 to the GSA) and Matrix Work as though it had been notified by AllRegs and will provide the designated AllRegs contact person with the applicable details. TENA will utilize AllRegs notices regarding potential Analysis and Commentary changes to help ascertain if an update, correction, change or addition is warranted in the Matrix Content.

c.  **The Review Process.** Upon discovery or receipt of notification of a possible change in a mortgage lending based statute and/or regulation, TENA will perform the following steps.

  i.  If upon discovery or receipt of notification of a possible change, TENA ascertains that the change will affect the Matrix Content, said required work will be initiated as soon as any TENA responsibilities regarding AllRegs' Analysis & Commentary Work as outlined in Schedule 1 has been completed.

  ii.  TENA's Matrix Work will consist of reading and analyzing the applicable statutory and/or regulatory materials and writing the applicable text outlining the core provisions and salient details of the material.

  iii.  Lastly, TENA will cause all such updates and changes to be transmitted to AllRegs on a daily basis for publication by AllRegs. TENA will identify to AllRegs all new, deleted and modified Matrix Work for review by AllRegs prior to its publication by AllRegs.

d.  **Delivery of the Matrix Work.** Each day, upon completion of its Matrix Work, TENA will deliver to AllRegs, in an electronic format, an updated copy of all Matrix Work.

e.  **Reasonable Timeliness.** Both parties acknowledge that the Matrix Work review process described above must be completed by TENA in a reasonably timely manner. For purposes of this work, reasonable timeliness shall mean that TENA will use its best efforts to complete the required work as quickly as other work requirements under the scope of this Schedule will permit. It is understood and acknowledged by both parties that reasonable timeliness during periods of low legislative activity may encompass as little as two or three business days while reasonable timeliness during periods of high legislative activity or legislative activity that produces prodigious amounts of statutory or regulatory material for review, may encompass several weeks. Subject to variances that are the result of routine employee turnover, TENA agrees to maintain staff levels adequate to handle average levels of work-load that are generated from this Schedule 2 and to give Schedule 2 related work priority over other non-Schedule related work. During periods of high work-loads, TENA will

strive to keep its Matrix Work turn-around time as short as possible but both parties acknowledge that the concept of reasonable timeliness will be extended to reflect the volume and scope of work then at hand. AllRegs acknowledges and agrees with this work balancing plan.

8. **Term of Schedule 2.**  The parties agree that this Schedule shall remain in full force and effect in perpetuity unless terminated pursuant to the provisions of Section 12 below or upon mutual agreement of the parties.

9. **Fees and Royalties.**  As full compensation for the Matrix Content and the Matrix Work provided hereunder and the rights with respect to the Matrix Content and the Matrix Work granted herein, during the term of this Schedule 2, AllRegs shall pay to TENA a quarterly royalty determined as follows:

   i.   An amount equal to fifty percent (50%) of AllRegs' Gross Receipts received from licensing of the Subscriber Version of the State Compliance ReportBuilder.

   ii.  As used herein, "Gross Receipts" shall mean the gross cash actually received by AllRegs during the Contract Quarter (as defined below) from licensing of the Subscriber Version of the ReportBuilder Work. "Subscriber Version" means any version of the State Analysis and Commentary Product that is made available to paid subscribers of AllRegs.

   iii. No royalties shall be payable for licenses of the ReportBuilder Work furnished free of charge by AllRegs to third-parties for review, advertising, sample or like purposes, or for complimentary subscriptions to any subscriber of AllRegs; however, any such complimentary subscription must be made for the sole purpose of promoting future subscriptions to and license fee income from the State Compliance ReportBuilder product.

   iv.  A material breach shall have occurred in the event that AllRegs fails in good faith to pay to TenA in a timely manner any monies due and owing under this Schedule 2 to TenA or in bad faith withholds any portion thereof.

10. **Payments and Accounting.**

   a.   As used in this Schedule 2, "Contract Quarter" shall mean a period of three (3) months commencing on the first day of January, April, July and October of each year and ending on the last day of each such designated calendar quarter, provided, however, that if the first Contract Quarter shall consist of fewer than three (3) full months it shall commence concurrent with the release of the State Compliance ReportBuilder product and end on the last day of the then current calendar quarter. By the 21st day of the month subsequent to the last day of a

calendar quarter, AllRegs shall pay to TENA all royalties earned through the end of the proceeding calendar quarter.

b. Along with each payment, AllRegs shall prepare and deliver to TENA a statement accounting for Gross Revenues during the applicable calendar quarter. Upon fourteen (14) days written notice, and no more than twice each Contract Year, a representative of TENA skilled in accounting and acceptable to AllRegs, or a certified public accountant hired by TENA, may examine the books and records of AllRegs which relate solely to the services provided by TENA under the provisions of this Schedule 2. Such examination shall be at AllRegs' principal place of business, during usual business hours, and at TENA's expense. Any statement provided hereunder shall be binding on TENA if no objection to the statement is provided to AllRegs in writing within one (1) year of issuance of the statement unless subsequent investigation or inquiry indicates that deliberate malfeasance or misrepresentation on the part of AllRegs is likely to have occurred in which case the time provided for TENA to make an objection to a statement shall automatically be extended to three (3) years.

11. **Timely Delivery.** Timely delivery of the Matrix Work is of the essence in this Schedule 2. If TENA fails to deliver any portion of the Matrix Work in a reasonably timely manner as provided in Section 7(e) hereof, as determined in AllReg's sole discretion, such failure shall constitute a Material Breach of this Schedule 2, the remedy for which is provided in Section 13(b) herein. Should AllRegs terminate this Schedule due to TENA'S breach of this Timely Delivery provision, AllRegs shall calculate the royalties due TENA through the date that AllRegs notified TENA of the material breach.

12. **Quality Work.** If any portion of TENA'S Matrix Work, at any time, is not, in AllRegs' judgment, an accurate portrayal of the facts, AllRegs shall within three (3) business days of reaching such determination, notify TENA that such portion of the Matrix Work is not, in AllRegs' opinion, accurate or is otherwise unsatisfactory and AllRegs shall request TENA to review the Matrix Work in question in order to ascertain its suitability for publication. If TENA agrees to make such changes, TENA shall do so within thirty (30) days after AllRegs' request. TENA shall not be entitled to any additional compensation therefore. If TENA disagrees with AllRegs' view on the accuracy of any Matrix Work and there is no concurrence on the matter by the Parties, the matter will be referred to a third party legal resource acceptable to both Parties. The interpretative position of each party to this Schedule will be presented to said third party legal resource who will be asked to provide an interpretation of the matter under dispute. Both parties to this Schedule 2 agree to accept such third party legal resource interpretation as the definitive interpretation and TENA agrees to incorporate said interpretation into the Matrix Content and AllRegs agrees to accept such interpretation for publication as part of the State Compliance ReportBuilder. Any fees charged by the third party legal resource will be split and paid equally by TENA and AllRegs.

13. **Termination Provisions.**
 **a.** **Standard Termination Provisions.** Either party may terminate this Schedule 2 at any time upon at least two calendar quarters written notice to the other party, said

notice to be made effective on January 1, April 1, July 1 or October 1. Not later than the 21st day of the month subsequent to the termination date, AllRegs shall make a final reconciliation of fees due under this Schedule and pay TENA any final fees then due TENA. In the event the final reconciliation indicates that TENA has been overcompensated for its work and that a refund is due to AllRegs, TENA shall make such payment to AllRegs within ten (10) days of receipt of the final reconciliation from AllRegs.

b. **Accelerated Termination Provisions.** Either party may terminate this Schedule 2 immediately, upon written notice to the other party, in the event that the other party:

    i. breaches a material provision of either the GSA or this Schedule 2 and fails to cure such breach within thirty (30) days of written notice demanding a cure for such breach (a "Material Breach");

    ii. ceases to conduct business in the ordinary course of business;

    iii. is adjudged bankrupt and is placed in the hands of a receiver or makes an assignment for the benefit of creditors.

c. **Material Breach.** In addition to other Material Breach provisions outlined in this Schedule 2, Material Breach of this Schedule 2 shall also include, (i) failure by TenA to make a good faith effort to keep and maintain the Matrix Content in such a manner as to render the State Compliance ReportBuilder fit for marketing, sales and the retention of existing customers by AllRegs, which includes, but is not limited to, failing to update the Matrix Content when statutes and regulations are amended, repealed or enacted, if known to TenA, and failing to perform due diligence in monitoring such statutes and regulations to discover such amendments, repeals or enactments; and (ii) failure by AllRegs to make an ongoing good faith effort to promote and market the State Compliance ReportBuilder in such a way as to optimize sales and profitability of this product or an intentional action by AllRegs which strategically serves to dilute or undercut the value of the State Compliance ReportBuilder such that the net result is a material diminishment of income for TenA.

d. **Rights to State Compliance Matrices After Termination.** AllRegs agrees and acknowledges that upon termination of this Schedule 2 for any reason, TENA shall continue to have, in accordance with Section 3 of this Schedule, but subject to the contrary provisions of Section 14(c), the sole and exclusive right, title and interest in and to the ownership and copyright of Matrix Content and Matrix Work and any and all portions thereof.

14. **Actions After Termination.**

    a. In the event that TENA terminates this Schedule 2 pursuant to Section 13(b), AllRegs will deliver to TENA, within fifteen (15) days of termination, the State Compliance Matrices. Termination of this Schedule 2 shall not affect AllRegs' obligation to account for and pay to TENA any compensation due through the effective date of termination.

b. In the event that AllRegs terminates this Schedule 2 for any reason other than pursuant to Section 13(b)(i), 13(b)(ii), 13(b)(iii) or mutual agreement, AllRegs cannot issue a competing or similar product for 3 years from the date of termination.

c. In the event that TENA terminates this Schedule 2 for any reason other than pursuant to Section 13(b)(i), 13(b)(ii), 13(b)(iii) or in the event that this Schedule 2 is terminated by AllRegs as a result of TenA's breach under the provisions of 13(b)(i), as determined by a court of competent jurisdiction as outlined in paragraph 13 of the General Services Agreement or 13(b)(ii), then AllRegs shall have an option to purchase a non-exclusive copy of TenA's State Compliance Matrices for One Dollar ($1.00), and upon exercise of such option by AllRegs, TenA shall transfer and deliver, free and clear of any lien or other encumbrance, the following: (1) a complete, non-exclusive electronic copy of the then existing State Compliance Matrices, along with right, title and interest in and to the ownership of such copy and joint copyright thereto; (2) a complete, non-exclusive copy of the Matrix Database Maintenance Tool, including, without limitation, source code and object code versions thereof, interpretive comments, documentation and user manuals relating thereto that have been created, sufficient to enable AllRegs to use, modify and create derivatives of the Matrix Database Maintenance Tool in connection with the State Compliance ReportBuilder; and (3) a non-exclusive, royalty-free, perpetual license throughout the world to use, reproduce, and make derivatives of the Matrix Database Maintenance Tool in connection with the State Compliance ReportBuilder. TENA acknowledges and agrees that, in the event that AllRegs exercises the foregoing option, AllRegs shall have a non-exclusive, royalty-free, perpetual license throughout the world to use, reproduce, and make derivatives of the Matrix Database Maintenance Tool in connection with the State Compliance ReportBuilder.

d. In the event that AllRegs terminates this Schedule 2 for any reason other than pursuant to Section 13(b)(i), 13(b)(ii), 13(b)(iii), or in the event that this Schedule 2 is terminated by TENA as a result of AllRegs' breach under the provisions of 13(b)(i), as determined by a court of competent jurisdiction as outlined in paragraph 13 of the General Services Agreement or 13(b)(ii), then TENA shall have an option to purchase a non-exclusive copy of AllRegs User Interface for One Dollar ($1.00), and upon exercise of such option by TENA, AllRegs shall transfer and deliver, free and clear of any lien or other encumbrance, the following: (1) a complete, non-exclusive copy of the User Interface, including, without limitation, source code and object code versions thereof, interpretive comments, documentation and user manuals relating thereto that have been created, sufficient to enable TENA to use, modify and create derivatives of the User Interface in connection with the State Compliance ReportBuilder along with joint right, title and interest in and to the ownership of such copy and joint copyright thereto; and (2) a non-exclusive, royalty-free, perpetual license throughout the world to use, reproduce, and make derivatives of the User Interface in connection with the State Compliance ReportBuilder. AllRegs

acknowledges and agrees that, in the event that TENA exercises the foregoing option, TENA shall have a non-exclusive, royalty-free, perpetual license throughout the world to use, reproduce, and make derivatives of the User Interface in connection with the State Compliance ReportBuilder.

**IN WITNESS WHEREOF,** the parties have executed this Schedule as of the date first above written.

Mortgage Resource Center, Inc. d/b/a AllRegs

By _____

Its _Jeffrey Hoersier President_

Date _2/28/06_

TENA Companies, Inc. d/b/a TENA

By _____

Its _Terry R Schopfer CEO_

Date _3/7/06_

# Exhibit C

## AMENDMENT, ASSIGNMENT, ASSUMPTION AND WAIVER AGREEMENT

Mortgage Resource Center, Inc. (d/b/a AllRegs), a Minnesota corporation (hereinafter, "Assignor") and TenA Companies, Inc. a Minnesota corporation (hereinafter, "Vendor") and Ellie Mae, Inc. a Delaware corporation (hereinafter "Purchaser") are desirous of entering into this tri-party Amendment, Assignment, Assumption and Waiver Agreement (hereinafter, "Amendment"). The following definitions apply to this Amendment.

| | |
|---|---|
| **GSA:** | General Services Agreement dated 2/1/2005 between Assignor and Vendor |
| **Schedule 2:** | Schedule 2 to the GSA (State Compliance ReportBuilder) dated 2/28/2006 between Assignor and Vendor |
| **Agreement:** | The combined GSA and Schedule 2 |
| **Sale Transaction:** | The acquisition by Purchaser and sale by Assignor of certain assets to Purchaser, including all of Assignor's right, title, interest and obligations under the Agreement. |
| **Assignment:** | The assignment to Purchaser of all of Assignor's right, title, interest and obligations under the Agreement. |
| **ReportBuilder:** | A subscription based on-line computer product developed and marketed as outlined by the Agreement. |
| **Brand:** | The name, term, design, symbol, or any other feature that identifies one seller's product distinct from those of other sellers. |

WHEREAS, Assignor and Vendor are parties to the Agreement

WHEREAS, the Sale Transaction requires an Assignment of the Agreement

WHEREAS, pursuant to the terms of the Agreement, Vendor's written consent is required to effect the Assignment; and

WHEREAS, as a condition to Purchaser's willingness to complete the Sale Transaction and execute the Assignment, the parties desire to execute this Amendment to modify the scope of certain provisions in the Agreement relating to Purchaser's and Vendor's ability to compete in certain lines of businesses or sell certain products or services.

NOW, THEREFORE, by execution of this Amendment, the Assignor, Vendor and Purchaser hereby agree as follows:

1.  Vendor hereby consents to the Assignment and waives any rights Vendor may have under the Agreement that may otherwise be triggered upon the closing of the Sale

Transaction in connection with the Assignment, including but not limited to rights of notice, response period, termination or acceleration, and hereby acknowledges and agrees that the Agreement shall remain in full force and effect in accordance with its terms following the closing of the Sale Transaction and the execution of the Assignment. To the extent that the Agreement provides for any ongoing obligations of Purchaser, as the assignee of the Agreement, after the date of the Sale Transaction, such obligations shall terminate in accordance with the termination provisions outlined in the Agreement.

2. Vendor agrees to execute such further documents and instruments and to take such additional actions, at Purchaser's expense, as may reasonably be requested by Purchaser, to vest in Purchaser any and all of the rights and obligations of the Assignor under the Agreement and otherwise to effectuate the provisions of this Amendment.

3. All Parties hereby agree to waive the application of any provisions in the Agreement, including without limitation, Section 2(b) of the GSA, Section 6 of Schedule 2, and Section 14(b) of Schedule 2, that expressly purport to prevent Purchaser and/or Vendor from developing, selling or otherwise providing any competing or similar product or service to ReportBuilder or any other product or service contemplated by the Agreement, so long as any such competing or similar products and services are developed, sold, or otherwise provided in a manner that is independent and distinct from that of the AllRegs' brand of products and services. The provisions of this Section 3 notwithstanding, all Parties agree and acknowledge that Purchaser is constrained from the development, sale or offering of any product or service under the AllRegs Brand that directly competes with ReportBuilder during the Term of the Agreement. In addition, in the event Purchaser terminates the Agreement for any reason other than pursuant to Section 13(b)(i), 13(b)(ii), or 13(b)(iii) of Schedule 2, or by mutual Agreement, Purchaser cannot issue a competing or similar product to ReportBuilder under the AllRegs Brand for 3 years from the date of termination.

4. The Parties agree to modify Section 3 of Schedule 2, to change the scope of the license granted by Vendor to Assignor to use the State Compliance Matrices from an exclusive license to a non-exclusive license. All other language in Section 3 of Schedule 2 remains unchanged.

5. In connection with any product that Purchaser develops or acquires that may directly or indirectly compete with ReportBuilder, Purchaser will not utilize or incorporate any products or software code of Assignor in existence immediately prior to the consummation of the Sale Transaction or any reasonable extensions and/or

improvements thereto that occurs after consummation of the Sale Transaction, during the Term the Agreement.  In addition, in the event Purchaser terminates the Agreement for any reason other than pursuant to Section 13(b)(i), 13(b)(ii),  or 13(b)(iii) of Schedule 2, or by mutual Agreement, Purchaser may not utilize or incorporate any products or software code of Assignor in existence immediately prior to the consummation of the Sale Transaction or any reasonable extensions and/or improvements thereto that occurs after consummation of the Sale Transaction  for 3 years from the date of termination.

6. Purchaser's utilization of the State Compliance Matrices by Purchaser and/or Assignor is restricted exclusively for use as a component of the ReportBuilder product and Purchaser may not incorporate the State Compliance Matrices in any other product or service.

7. Except as expressly set forth herein, this Amendment shall not be deemed to modify any other provision(s) of the Agreement governing Vendor's ownership of, nor Assignor's or Purchaser's right to utilize, the State Compliance Matrices.

8. This Amendment shall constitute an amendment to the Agreement pursuant to Section 16 thereof. The intent of this Amendment is to modify provisions of the Agreement specifically as they pertain only to Purchaser and Vendor. It is not intended to modify Assignor's obligations and responsibilities toward Vendor as outlined in the Agreement.

9. Purchaser, Assignor and Vendor agree to be bound by all terms of the Agreement as modified by this Amendment. All Parties acknowledge that a material breach of this Amendment shall constitute a material breach of the Agreement and the remedies for a material breach outlined in the Agreement will prevail.

10. All parties acknowledge and agree that, except for Schedule 2 to the Agreement, no other Schedules to the Agreement are currently in force and effect.

11. This Amendment shall only be effective upon consummation of the Sale Transaction. In the event the Sale Transaction is not consummated, this Amendment shall be null and void.

12. Capitalized terms not defined herein shall have the meanings assigned to them in the Agreement.

[Signatures follow on next page]

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Amendment as of the date of the last signature set forth below.

**Ellie Mae, Inc.**

By: _____

Name: Jonathan Corr

Title: President

Date: 8/6/14

**TenA Companies, Inc.**

By: _____

Name: Patrick J. Stevens

Title: General Counsel

Date: 8/1/14

**Mortgage Resource Center, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Amendment as of the date of the last signature set forth below.

**Ellie Mae, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

**TenA Companies, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

**Mortgage Resource Center, Inc.**

By: _____

Name: Jeffrey Hoerster

Title: President

Date: 8/1/18